# IN THE COURT OF APPEALS OF IOWA

No. 24-1253
Filed August 20, 2025

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**CRAIG DEWAYNE LIND,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Scott County, Patrick A. McElyea,

Judge.


        A defendant appeals his conviction for forgery.  **AFFIRMED**.


        Martha J. Lucey, State Appellate Defender, and Ella M. Newell, Assistant

Appellate Defender, for appellant.

        Brenna Bird, Attorney General, and Martha E. Trout, Assistant Attorney

General, for appellee.


        Considered without oral argument by Tabor, C.J., and Ahlers and

Langholz, JJ.

**LANGHOLZ, Judge.**

After presenting a fraudulent check to a bank teller, Craig Lind was convicted of forgery. Lind appeals his conviction after a jury trial, arguing that the State failed to prove that he knew the check was altered before presenting it to the teller or that he had the specific intent to defraud the bank or knowledge that he was helping to defraud the bank. According to Lind, he was duped by a third party to cash the check and did not look at it until after presenting it to the teller. But the jury rejected Lind's explanation, and substantial evidence supports that verdict. We thus affirm Lind's conviction.

I.

In April 2023, Lind went into a branch of Quad City Bank and Trust in Bettendorf to cash a check. The check—made payable to Lind—was for $2288.11 from the City of Davenport. As he handed the check to a bank employee, she "noticed some inconsistencies" compared to what she usually saw with checks. So she entered the check number into the bank's positive pay system. That system allows a bank customer, like the City of Davenport, to input information about the checks it writes so that the bank can verify whether the information on a check presented matches. Because the information in the system did not match the check Lind presented, the bank employee told Lind that she would be unable to cash the check for him.

The bank employee then took the check to an experienced vice president in the bank's treasury management department. The vice president also examined the check and noticed four irregularities. First, in the top left-hand corner of the check, it said "payable threw" instead of "payable thru" the bank. Second, the

"typewriter type font" used for Lind's name and address on the check was "unusual," which she testified typically indicates a fraudulent check. Third, there was a physical signature on the check, which was "unlikely" for a check from the City of Davenport. And fourth, the signature did not match the signature that the bank had in its system for the alleged signor.

After being told that the check could not be cashed, Lind called the police. And a Bettendorf police officer responded to the bank. The officer spoke with the bank employee who received the check, the vice president, and Lind. Lind told the officer that a man pulled up in a car outside the motel where he lived in Moline, Illinois, and offered to pay him a couple of hundred bucks to pick up trash. Lind agreed and got in the car with the man. Lind described the man as "a small black guy." And Lind said the man—whom he had never met before—introduced himself as Tony.

Lind told the officer that Tony stopped at a fast-food restaurant, might have gone into a neighboring motel, and then returned with a check made out to Lind. According to Lind, Tony told him he needed to cash the check so that Tony could pay him in cash. And Lind claimed that Tony's car—now driven by a different man while Tony and a woman were also in the car—dropped him off right at the corner of the street and entrance drive to the bank property.

Lind told the officer that he realized the check was fraudulent "when I went to cash the damn thing." Lind explained "I gave it to them, and I'm going something ain't right here" because the check said it was from the City of Davenport and made out to him. The officer questioned why Lind still gave the check to the bank and Lind said he thought Tony worked for the city and he "wasn't trying to cash the

damn check—why would I stick around?" When the officer pressed, reminding Lind, "You walked into the bank and gave them the check," Lind acknowledged, "It sounds weird to me too."

Lind described the car to the officer as a dark blue Toyota RAV4 and gave the officer the license plate number. At the bank, the officer reviewed video footage but did not see Lind getting dropped off at the bank property. Rather, the video showed Lind walking from down the street—with no sign that he was dropped off. When Lind failed to have a satisfactory explanation for this discrepancy, and given the other evidence, the officer arrested Lind at the bank.

Later, the officer used Bettendorf's automatic-license-plate-reader system to search for the license plate number that Lind gave him and separately for the make and model of the car. He did not get any matches for the license plate number, variations of the license plate number, or Toyota RAV4s matching the description given that had been driving in Bettendorf at the time that Lind said he and Tony got into town. Across the city, there are about sixty license plate reader cameras. And around the bank alone, there are about fifteen cameras. The officer testified that "[i]t would be nearly impossible to drive around the city without driving through" a camera. The officer also "reviewed some traffic camera footage" and did not see Lind getting dropped off anywhere around the bank.

Lind was charged with forgery in violation of Iowa Code section 715A.2(2)(a) (2023). At a two-day trial in May 2024, the jury heard the testimony of the bank employee who received the check, the treasury vice president, and the police officer. The jury also saw the officer's bodycam video, which was admitted into evidence, showing Lind's conversation with the officer at the bank. For his

defense, Lind called one of his neighbors at the motel to testify and Lind testified on his own behalf.

In his testimony, Lind recounted the same story he told the officer about Tony giving him the check to cash. He again said that he was dropped off at "the side of the bank" and walked up the sidewalk "that goes right to the bank" at the end of the sidewalk. And in conflict with the bank employee's earlier testimony that the check "was not worn in any way" and "was not creased or folded," Lind said that when Tony gave him the check, "[i]t was folded up" and Lind put it in his pocket until presenting it to the bank employee to cash. Only then, according to Lind, after the bank employee "open[ed] it up" did he see the face of the check: "It was $2,200. And I'm going, Damn. And the way she looked at me, I'm going crap."

The jury found Lind guilty of forgery. And the district court imposed a suspended five-year prison sentence and placed Lind on probation for two years.

Lind now appeals his conviction.

II.

We review Lind's challenge to the sufficiency of the evidence supporting his forgery conviction for correction of errors at law. *See State v. Crawford*, 972 N.W.2d 189, 202 (Iowa 2022). We are bound by the jury's verdict "if the verdict is supported by substantial evidence." *Id.* "Evidence is substantial if it would convince a rational fact finder that the defendant is guilty beyond a reasonable doubt." *State v. Acevedo*, 705 N.W.2d 1, 3 (Iowa 2005). But the evidence must do more than "create suspicion or speculation." *State v. Uthe*, 542 N.W.2d 810, 815 (Iowa 1996). When examining the evidence, we take it "in the light most favorable to the State, giving the State all reasonable inferences and presumptions

the evidence will bear." *Id.* "Direct and circumstantial evidence are equally probative." *Id.* And a verdict can be based on circumstantial evidence alone. *State v. Shortridge*, 589 N.W.2d 76, 80 (Iowa Ct. App. 1998).

To convict Lind of forgery under Iowa Code section 715A.2(2)(a), the jury must have found—as it was instructed—that the State proved three elements: (1) that Lind "uttered a check" that he "knew had been altered," (2) that he "knew the check had been altered so it would appear to be the act of one who did not authorize the act," and (3) that he either "specifically intended to defraud or injure Quad City Bank & Trust" or "knew he was helping to accomplish a fraud or injury." *See State v. Mathis*, 971 N.W.2d 514, 518 (Iowa 2022) (explaining that unopposed jury instructions become the law of the case when reviewing whether sufficient evidence supports a conviction). The jury was also instructed that uttering a check means offering it to a person and representing it as genuine. And it was instructed that specifically intending an act means "not only being aware of doing an act and doing it voluntarily, but in addition, doing it with a specific purpose in mind."

Lind does not dispute that he uttered a check that was altered. But he argues that he did not *know* the check was altered or intend to defraud the bank. And so, he claims that the State failed to prove any of the three essential elements. We disagree. Viewing the evidence in the light most favorable to the State, substantial evidence supports the jury's verdict that Lind knew the check was altered and had the specific intent to defraud the bank or knew that he was helping to defraud the bank.

To be sure, the State did not have direct evidence from Lind admitting to his knowledge or intent. But "[i]ntent to defraud, like any other fact, may be proved by

circumstantial evidence, and in a case like this that is usually necessary." *State v. Coburn*, 244 N.W.2d 560, 563 (Iowa 1976) (cleaned up). And there was plentiful circumstantial evidence here. For starters, Lind presented a check written out to him for $2288.11 from the City of Davenport. Even Lind acknowledged—as the jury saw on the bodycam video—that when he saw the check, he knew it was fraudulent. And while he claimed this did not happen until after he presented the check to the bank because the check was folded up, the jury could have found it is not believable that someone would cash a check without first looking at it or that the bank employee's testimony that the check was not folded was more credible.

Similarly, the jury was free to accept or reject some or all of the rest of Lind's story about how he came to possess the altered check. Lind's version of events could not be verified by any camera or license plate reader in Bettendorf. And the bank footage contradicted it, showing that he approached the bank property on foot from down the street. Indeed, if the jury concluded that Lind must be lying about his version of events, that would be further evidence from which it could infer the required fraudulent intent. *See State v. Cox*, 500 N.W.2d 23, 25 (Iowa 1993) ("A false story told by a defendant to explain or deny a material fact against him is by itself an indication of guilt and the false story is relevant to show that the defendant fabricated evidence to aid his defense.").

Bottom line, substantial evidence supports the jury's verdict that Lind knew the check was altered before presenting it to the teller and that he had the specific intent to defraud the bank or knowledge that he was helping to defraud the bank. And so, we affirm Lind's forgery conviction.

**AFFIRMED**.